INLINER AMERICAS, INC. n/k/a First-Liner Americas, Inc.; InLiner USA, Inc. n/k/a FirstLiner USA, Inc.; and Cat Contracting, Inc., Appellants,

v.

MACOMB FUNDING GROUP, L.L.C., Appellee.

No. 14–08–00350–CV.

Court of Appeals of Texas, Houston (14th Dist.).

July 22, 2010.

Timothy A. Hootman, Lance Christopher Kassab, Houston, for appellants.

Barry Abrams, Houston, for appellee.

Panel consists of Justices YATES, SEYMORE, and BROWN.

## OPINION

JEFFREY V. BROWN, Justice.

After the appellants defaulted on a secured loan and their creditor began proceedings to foreclose on the collateral, the appellants assigned the collateral to the creditor. Under the terms of the parties' agreements, the "collateral" was defined to include all assignable causes of action the appellants owned or later acquired, as well as the proceeds of such collateral. In the central issue in this case, we are asked to determine whether, as a result of the pledge and assignment, the appellants transferred to the creditor unrelated legal-malpractice claims or the funds appellants received to settle the claims. We conclude that the malpractice claims were not assignable; thus, it was not "collateral" as the parties defined the term, and the settlement funds are not the proceeds of such collateral. We therefore reverse and render declaratory judgment in the appellants' favor.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1990, Insituform Technologies, Inc. sued appellants InLiner Americas, Inc. n/k/a FirstLiner Americas, Inc., InLiner USA, Inc. n/k/a FirstLiner USA, Inc. (collectively, "InLiner"), and CAT Contracting Inc. for patent infringement.[1] On September ber 30, 1995, the court ruled in Insituform's favor on the issue of liability.[2]

On August 20, 1997, InLiner, CAT (collectively, "the debtors"), and Gulio Catallo signed a promissory note in which they agreed to pay MaComb Funding Group, L.L.C., the principal amount of $1.5 million at the rate of 17.5 percent on or before July 1, 1999. On the same day, the parties signed a security agreement in which the debtors granted MaComb a security interest in certain of their assets. The parties referred to the identified assets by the term, "Collateral," which they defined to include, "to the maximum extent same are assignable pursuant to the terms thereof, all ... causes of action ... [and] [a]ll products and proceeds of any and all of the foregoing Collateral."

The debtors defaulted on the loan in July 1999, and on August 30, 1999, a federal court awarded Insituform damages in the amount of $9,546,289.06.[3]

MaComb filed suit on the loan in December 1999. The following month, the parties entered into an agreed interlocutory judgment in which the debtors acknowledged joint and several liability for all sums due under the promissory note, as well as costs, attorneys' fees, interest, and any other expenses. To prevent MaComb from executing on the judgment, the parties entered into a Possession, Manage-

---

1. See Insituform Techs., Inc. v. Cat Contracting, Inc., 99 F.3d 1098 (Fed.Cir.1996), cert. denied, 520 U.S. 1198, 117 S.Ct. 1555, 137 L.Ed.2d 703 (1997), appeal after remand, 113 F.3d 1258 (Fed.Cir.1997), appeal after remand, 161 F.3d 688 (Fed.Cir.1998), cert. denied, 526 U.S. 1018, 119 S.Ct. 1254, 143 L.Ed.2d 350 (1999), on remand, No. Civ.A.H-90-1690, 1999 WL 33914622 (S.D.Tex. Aug. 30, 1999) (not designated for publication), rev'd in part and vacated in part, 10 Fed.Appx. 871 (Fed.Cir.2001) (not designated for publication), vacated, 535 U.S. 1108, 122 S.Ct. 2322, 153 L.Ed.2d 151 (2002), on remand, 81 Fed.Appx. 320 (Fed.Cir.2003) (not designated for publication), after reinstatement of appeal, 87 Fed.Appx. 180 (Fed.Cir.2004) (not designated for publication), after remand, 385 F.3d 1360 (Fed.Cir.2004), on remand, 518 F.Supp.2d 876 (S.D.Tex.2007).

2. Insituform, 518 F.Supp.2d at 880.

3. Insituform, 1999 WL 33914622, at *32.

ment, and Assignment Agreement ("PMA agreement") on June 22, 2000.

The PMA agreement provides in pertinent part:

> WHEREAS, to date the Debtor has been unable to pay and satisfy in full the Judgment, and so the parties have now agreed that MaComb will conduct a "strict foreclosure," in accordance with the laws of the State of Texas, against the [collateral] [4] and the Debtor and in full satisfaction of the Judgment, except as herein stated: in connection therewith, the Debtor has agreed to (i) transfer possession of the [collateral] ... to MaComb, (ii) manage, supervise, and maintain such [collateral] for the benefit of MaComb, [and] (iii) defend, indemnify, and save harmless MaComb in connection with all obligations, liabilities, claims, causes-of-action, and/or losses which arise with respect to the [collateral] during the "Term" ... of this Agreement....

> ...

> 1. *Grant of Possession and Assignment of Leases:* [The debtors] hereby grant, sell, convey, transfer, and assign to MaComb all of the [collateral].... Provided, however, MaComb does not hereby assume any responsibility or obligation for any liabilities of [the debtors] pertaining to such [collateral], except to the extent that MaComb hereafter expressly assumes one or more of such liabilities in writing. MaComb is deemed herewith in lawful

possession of such [collateral], subject to the terms, conditions, and provisions of this Agreement.

In 2003, InLiner, CAT, and Catallo asserted legal-malpractice claims against the attorneys who represented them in the federal patent litigation.[5] In 2005, InLiner and CAT also asserted a declaratory judgment action against MaComb, seeking a declaration that MaComb did not acquire their legal-malpractice claims through the PMA agreement. MaComb asserted a counterclaim seeking a declaration that it had acquired the malpractice claims.

MaComb and the debtors filed cross-motions for traditional summary judgment. MaComb asserted that (1) the debtors' "assignment to MaComb of their rights in 'all causes of action' and any resulting 'proceeds,' was part of a general assignment in a commercial setting and transaction that encompasses a panoply of other assigned rights, duties and obligations"; (2) the debtors' "assignment to MaComb does not violate Texas public policy and is enforceable because it does not 'necessitate a duplicitous change in the positions taken by the parties in antecedent litigation' between them"; and (3) "MaComb is the lawful owner of the Claims and entitled to the proceeds of any judgment or settlement of the Claims." The debtors argued, inter alia, that any assignment of the legal-malpractice claims or proceeds was void because such claims are not assignable as a matter of law and public policy.

4. In the PMA agreement, the parties noted that InLiner's assets, "which are described in the Security Agreement and the various UCC Financing Statements executed and filed in connection therewith, were pledged as security for the payment and performance of the Debtor under the Note and Loan Agreement." In other words, the "Assets," as that term is used in the PMA agreement, are the same as "Collateral," as that term is defined in the security agreement. For clarity, we refer to all such property and rights as "collateral."

5. These defendants include Edward W. Goldstein, Susan K. Knoll, and the firms with which they each have been affiliated: Arnold, White & Durkee, L.L.P.; Arnold, White & Durkee, Corp.; Howry, Simon, Arnold & White, L.L.P.; and Goldstein & Polasek.

**4**

The trial court denied the debtors' summary-judgment motion and granted MaComb's motion. In a separate judgment, it awarded MaComb attorneys' fees in the amount of $40,372.30.

The debtors and MaComb brought an interlocutory appeal, which we dismissed as untimely. *Inliner Americas, Inc. v. MaComb Funding Group, L.L.C.*, 244 S.W.3d 427 (Tex.App.-Houston [14th Dist.] 2007, pet. dism'd).[6] InLiner and CAT then settled their claims against the malpractice defendants, and the trial court signed a final judgment. This appeal ensued.

## II. ISSUES PRESENTED

The debtors present five issues on appeal. In their first issue, they contend that the trial court erred in granting summary judgment in MaComb's favor and denying their cross-motion for summary judgment. Their arguments in support of this position are set forth in their remaining issues, half of which are based on the assertion that the parties' agreements do not express an intent to pledge or assign their legal-malpractice claims. Specifically, the debtors assert in their second issue that their legal-malpractice claims were not assigned because the cause of action did not exist when the parties executed the security agreement in August 1997, and they argue in their fourth issue that the security agreement does not identify the causes of action included in the collateral with reasonable certainty. In their remaining arguments, the debtors contend that any purported pledge and assignment of their malpractice claims is unenforceable. In particular, they contend in their third issue that the assignment must fail because the debtors did not surrender all

control over the legal-malpractice claims, and they argue in their fifth issue that the assignment of such claims is contrary to nationwide policy and Texas precedent.

## III. STANDARD OF REVIEW

In a traditional motion for summary judgment, the movant has the burden of showing that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex.1997). To be entitled to traditional summary judgment, a defendant must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Id.* Evidence is conclusive only if reasonable people could not differ in their conclusions. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex.2005). When both parties move for summary judgment and the trial court grants one motion and denies the other, we review the summary-judgment evidence presented by both sides, determine all questions presented, and render the judgment the trial court should have rendered. *Tex. Workers' Compensation Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 648 (Tex. 2004) (citing *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000)).

## IV. ANALYSIS

■ The dispositive issues presented in this appeal require us to answer two questions. First, do the agreements express an intent to pledge and transfer all assignable causes of action and their proceeds? And if so, are the legal-malpractice claims

---

**6.** The Texas Rules of Appellate Procedure were subsequently amended, and as rewritten, Rule 28.2 now permits a notice of an agreed appeal to be filed up to twenty days after the trial court signs an order granting the parties permission to appeal. *See* TEX. R.APP. P. 28.2(a).

such assignable causes of action? We begin our analysis with the debtors' arguments concerning the terms of the parties' agreements.

Our primary concern in interpreting a contract is to ascertain the true intent of the parties as expressed in their agreement. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex.2006). Generally, the writing alone is sufficient to express the parties' intentions, "for it is objective, not subjective, intent that controls." *Matagorda County Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex.2006) (per curiam) (quoting *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex.1968)). We therefore examine the writing as a whole to harmonize all of its provisions so that none will be rendered meaningless. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex.2003); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). We presume that the parties to a contract intend every clause to have some effect. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996). Thus, no single provision is given controlling effect, and all provisions are considered with reference to the entire contract. *J.M. Davidson*, 128 S.W.3d at 229. In analyzing the contract, we give terms their plain, ordinary, and generally accepted meaning unless the contract shows the parties used them in a technical or different sense. *Heritage Res.*, 939 S.W.2d at 121; *see also Hewlett–Packard Co. v. Benchmark Elecs., Inc.*, 142 S.W.3d 554, 561 (Tex.App.-Houston [14th Dist.] 2004, pet. denied) ("We construe a contract from a utilitarian standpoint, bearing in mind the particular business activity sought to be served."). We determine how the "reasonable person" would have used and understood the contract's language, considering the circumstances surrounding its negotiation and keeping in mind the purposes intended to be accomplished by the parties when entering into the contract. *Nat'l Union Fire Ins., Co., of Pittsburgh, Pa. v. Ins. Co. of N. Am.*, 955 S.W.2d 120, 127–28 (Tex.App.-Houston [14th Dist.] 1997), *aff'd sub nom. Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 20 S.W.3d 692, 704 (Tex.2000).

## A. Scope of the Parties' Agreements

The debtors first contend that the security agreement is limited in both scope and time. Specifically, they argue that the security agreement "provides the date—August 20, 1997—of the parties' intent as to what they included as security," and contend that the legal-malpractice claims are not included because they did not exist before August 31, 1999, when judgment was entered against them in the patent-infringement case. In support of this argument, the debtors purport to quote the security agreement as providing that each debtor granted to MaComb "a lien or security interest in, all such Debtor's right, title and interest in . . . the following (the 'Collateral')." This statement is then followed by an itemized list of those assets pledged to secure the loan; the legal-malpractice claims are not included in the list.

The debtors' argument, however, is based on selective editing of the security agreement. This section actually provides as follows:

> The Debtors hereby grants [sic] to the Secured Party a lien or security interest in, [sic] all of such Debtors's [sic] right, title and interest in and to all of the following assets of the Debtors, *now owned or hereafter acquired,* except as otherwise excluded on *Schedule I* hereto, including, without limitation, the following (the "*Collateral*") . . . .

(emphasis added). We cannot ignore the language emphasized above. *See McMa-*

*han v. Greenwood,* 108 S.W.3d 467, 484 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (explaining that the intention of the parties to an agreement can be ascertained "only by looking at the entire contract"). The debtors contend their legal-malpractice claims accrued in August 1999, and they asserted in their summary-judgment motion that the claims "constitute after-acquired property." The claims therefore are encompassed within the plain meaning of "all causes of action" that were "hereafter acquired." Accordingly, we overrule the debtors' second issue.

Arguing that the security agreement is a release to which the fair-notice requirements of the express-negligence rule apply, the debtors also contend that their legal-malpractice claims are not identified with reasonable certainty, and thus, their assignment is unenforceable. Because this argument was not raised in the summary-judgment proceedings, it has not been preserved for our review. *See* Tex.R.App. P. 33.1(a)(1)(A); Tex.R. Civ. P. 166a(c). We therefore overrule the debtors' fourth issue. *See City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex. 1979) (holding that summary judgments cannot be reversed on grounds that were not presented to the trial court).

We conclude that, under the unambiguous terms of the parties' agreements, the debtors' legal-malpractice claims are among the causes of action conveyed to MaComb "to the maximum extent same are assignable."

### B. Assignability of the Legal–Malpractice Claims

The determination of assignability is a matter of both precedent and policy. *See Izen v. Nichols,* 944 S.W.2d 683, 685 (Tex. App.-Houston [14th Dist.] 1997, no writ). Because the parties' disagreement focuses primarily on the actual holdings of prior cases, we begin by addressing these arguments.

### 1. *Mallios v. Baker*

■ In Texas, assignments of legal-malpractice claims arising from litigation generally are invalid. *Zuniga v. Groce, Locke & Hebdon,* 878 S.W.2d 313, 318 (Tex.App.-San Antonio 1994, writ refd); *Vinson & Elkins v. Moran,* 946 S.W.2d 381, 395 (Tex.App.-Houston [14th Dist.] 1997, writ dism'd by agr.); *Baker v. Mallios,* 971 S.W.2d 581, 584 (Tex.App.-Dallas 1998), *aff'd on other grounds,* 11 S.W.3d 157 (Tex.2000). The debtors assert, and MaComb does not dispute, that the legal-malpractice claims at issue arose from litigation. *See* Tex.R.App. P. 38.1(g). Citing *Mallios v. Baker,* MaComb instead argued, both in its summary-judgment motion and on appeal, that "a majority of the Texas Supreme Court has endorsed the validity of assignments of malpractice claims as part of a general assignment in a commercial setting." This is incorrect.

In *Mallios,* a client, Baker, obtained a $1 million default judgment against an alleged tortfeasor. 11 S.W.3d at 158. Baker then answered the advertisement of a third party, Herron, offering to buy judgments. *Id.* Herron concluded that Baker's attorney, Mallios, had sued the wrong person. *Id.* In exchange for Herron's assistance in pursuing a legal-malpractice claim, Baker assigned Herron half of any net recovery. *Id.* Baker sued Mallios, and Mallios successfully moved for summary judgment on the ground that Baker's legal-malpractice claim was barred because Baker violated public policy by assigning the claim to Herron. *Id.* at 158–59.

The Texas Supreme court did not reach the question of whether an assignment under these or any other circumstances violated public policy. *Id.* at 159. Rather,

the court held that Mallios was not entitled to a take-nothing judgment *regardless* of whether the assignment violated public policy, because Baker agreed to assign only part of his claim. *Id.* The court expressed no view on the validity of "the assignment of a legal malpractice claim as part of a general assignment in a commercial setting"—a question that was not presented—and declined to rule on the validity of the only assignment actually before it.

Given the holding in the case, a statement by the court that the assignment did or did not violate public policy would have been dictum. And although we have stated that "[j]udicial dictum, a statement by the supreme court made very deliberately after mature consideration and for future guidance in the conduct of litigation, is 'at least persuasive and should be followed unless found to be erroneous,' "[7] the Mallios decision contains no such statement. Justice Hecht, writing on behalf of four members of the court, concurred with the majority, but would have held that commercial marketing of a legal-malpractice claim violates public policy.

As he explained, "the vice is not in a mere assignment of part of plaintiff's recovery, but in an assignment coupled with such control that the third party assignee has a commercial investment in the outcome and the power to protect it." *Id.* at 160 (Hecht, J., concurring). In a second concurring opinion on behalf of two members of the court, Justice Enoch joined in the majority's opinion, but wrote separately to clarify that, had the issue been reached, he would have held that the commercial marketing of legal-malpractice claims does not violate public policy.[8] The remaining three members of the majority expressed no opinion on the subject. Thus, the view endorsed by the majority of the *Mallios* court is no more and no less than that stated in the majority opinion. Contrary to MaComb's argument, no Texas court has held that a legal-malpractice claim is assignable in circumstances analogous to those presented here. Although there are circumstances, inapplicable here, in which a malpractice claim may be litigated by someone other than the client, the general rule is that policy concerns prohibit the assignment of legal-malpractice claims.[9]

---

7. *Edwards v. Kaye*, 9 S.W.3d 310, 314 (Tex. App.-Houston [14th Dist.] 1999, pet. denied) (quoting *Palestine Contractors, Inc. v. Perkins*, 386 S.W.2d 764, 773 (Tex.1964)); *but see Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 351 n. 12, 125 S.Ct. 694, 706 n. 12, 160 L.Ed.2d 708 (2005) ("Dictum settles nothing, even in the court that utters it").

8. Although the debtors have repeatedly pointed out changes in the membership of the Texas Supreme Court since *Mallios* was decided, such factors can play no part in our review. Changes in personnel are not changes in precedent, and judicial decisions must be "founded in the law rather than in the proclivities of individuals." *See Vasquez v. Hillery*, 474 U.S. 254, 265, 106 S.Ct. 617, 624, 88 L.Ed.2d 598 (1986) (explaining the role of stare decisis); *Weiner v. Wasson*, 900 S.W.2d 316, 320 (Tex.1995) (observing that "the legitimacy of the judiciary rests in large

part upon a stable and predictable decision-making process that differs dramatically from that properly employed by the political branches of government").

9. *See, e.g., Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 665 & n. 20 (Tex.2008) (stating that "this Court has held in a number of cases over the years that public policy clearly disfavors certain types of agreements" and citing *Zuniga* with the parenthetical "holding that assignment of legal malpractice claims was against public policy"); *State v. Oakley*, 227 S.W.3d 58, 61 & n. 19 (Tex.2007) (citing *Zuniga* with the parenthetical "rejecting assignment of legal malpractice claim"); *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners L.P.*, 146 S.W.3d 79, 87 n. 31 (Tex.2004)(describing *Zuniga's* holding as "prohibiting assignment of legal malpractice claims").

## 2. Policy Considerations

 The parties' summary-judgment and appellate arguments have addressed the trial court's ruling in terms of policy as well as precedent. *See Izen,* 944 S.W.2d at 685 (evaluating an assignment in light of the policy considerations raised in *Zuniga* and similar cases). Whether a contract violates public policy is a question of law, which we review de novo. *Lawrence v. CDB Servs., Inc.,* 44 S.W.3d 544, 555 (Tex. 2001), *superseded by statute on other grounds as stated in Storage & Processors, Inc. v. Reyes,* 134 S.W.3d 190, 192 (Tex.2004).

According to MaComb, the assignment of a legal-malpractice claim is unenforceable only if it violates public policy by "necessitat[ing] a duplicitous change in the positions taken by the parties" in the underlying litigation. Although that is one reason for refusing to enforce such an assignment, this is not the only policy concern addressed in *Zuniga* and its progeny. Texas courts have identified many reasons why the harm caused by the assignment of a legal-malpractice claim outweighs its benefits. Among other things, assignment of legal-malpractice claims could lead to commercial marketing of claims,[10] substitution of a malpractice claim for a claim against an insolvent defendant,[11] discouragement of voluntary settlement agreements,[12] compromise of client confidentiality,[13] and weakening of the attorney's duty of loyalty.[14] Some of these concerns apply here.

In particular, the *Zuniga* court cautioned that "assignability would make possible the commercial marketing of legal-malpractice causes of action by strangers, which would demean the legal profession." *Zuniga,* 878 S.W.2d at 316. If the malpractice claims in this case were assignable, then they formed part of the collateral identified in the security agreement, in which the parties specifically agreed that in the event of default, MaComb could "sell the collateral or any part thereof in one or more parcels at public or private sale, at any of [MaComb]'s offices or elsewhere, for cash or on credit, and upon such other terms as may be commercially reasonable."[15] Thus, treating the malpractice claims like the debtors' other assets as MaComb suggests would lay the groundwork for the kind of commercial marketing criticized by the *Zuniga* court. And although MaComb argues that it is not a stranger to the legal-malpractice claims at issue,[16] the result would be no less demeaning to the legal profession.

The *Zuniga* court also cautioned that a plaintiff with a claim against an insolvent defendant "has every incentive to look elsewhere for a source of funding" and could offer to waive collection from the defendant in return for assignment of the right to sue the defendant's lawyer. *Id.* at 317. This is very like the situation presented in this case: MaComb is a judgment creditor, and the debtors' pledged assets were assigned to avoid execution of the judgment. In arguing for assignment

---

**10.** *Zuniga,* 878 S.W.2d at 316.

**11.** *Id.* at 317.

**12.** *Wright v. Sydow,* 173 S.W.3d 534, 553 (Tex.App.-Houston [14th Dist.] 2004, pet. denied).

**13.** *See Moran,* 946 S.W.2d at 394.

**14.** *Mallios,* 11 S.W.3d at 165 (Hecht, J., concurring).

**15.** Although the parties do not contend that MaComb would attempt to sell the claims, "our decision must apply to cases generally." *Zuniga,* 878 S.W.2d at 317.

**16.** We express no opinion on this.

of the malpractice claims, MaComb seeks to substitute the attorneys for an insolvent debtor.

MaComb analogizes the assignment of the claims to the purchase of a business. There are, however, important distinctions. Although many of the debtors' assets were assigned to MaComb, the debtors managed the assets subject to MaComb's direction and remained responsible for any liabilities arising in connection with them.[17] Thus, if the legal-malpractice claims were assigned, then MaComb could direct the debtors to manage the malpractice litigation in a manner that risked sanctions, knowing that such liabilities would be borne by the debtors alone. *See Mallios*, 11 S.W.3d at 169 (Hecht, J., concurring). This would undermine the deterrent effect that sanctions are intended to serve. *See Cire v. Cummings*, 134 S.W.3d 835, 839 (Tex.2004).

In sum, we conclude that both precedent and policy prohibit the assignment of the debtors' malpractice claims. Here, as in *Zuniga*, the costs to the legal system of such an assignment outweigh its benefits. *See Zuniga*, 878 S.W.2d at 318.

## C. Assignability of Proceeds

MaComb argues that the debtors failed to address MaComb's distinct legal rights to any "proceeds" of the malpractice claims, and thus, it has a right to any funds paid to the debtors to settle such claims. We disagree. In its pleadings and its summary-judgment motion and response, MaComb asserted a right to the settlement funds only as the proceeds of the legal-malpractice claims, not as a distinct asset independent of such claims, and MaComb has an interest in InLiner's causes of action only if they are encompassed within the meaning of "collateral" as the parties defined that term. *See Grohman v. Kahlig*, 318 S.W.3d 882, 886–88 (Tex.2010) (per curiam) (relying on the parties' definition of "collateral" in evaluating whether a security interest was affected by the conversion of corporate shares into units of a limited partnership). Under the agreement, "collateral" includes "all causes of action," but only "to the maximum extent they are assignable." Thus, because the legal-malpractice claims are not assignable, that cause of action is not included within the definition of collateral. Proceeds are collateral only if they are proceeds "of the foregoing [c]ollateral." Therefore, because the legal-malpractice claims are not collateral, proceeds from the claims are not collateral either. MaComb's security interest in a claim's "proceeds" is determined by the assignability of the cause of action and is unaffected by the exchange of the cause of action for settlement funds. *Cf. id.* (where parties defined "collateral" to include shares of corporate stock and all replacements, substitutions, and proceeds of the shares, the shares retained their character as collateral even though they "changed form" into

---

**17.** This right is addressed in the PMA agreement as follows:

> *Management of [Collateral]:* During the Term of this Agreement, Debtor, jointly and severally, shall be fully responsible for managing and operating the [collateral] in accordance with its past practices, and in the ordinary care of the business operations of the Debtor, *provided that MaComb may at any time advise Debtor in writing of a required change in such management and business practices, and Debtor shall immedi-*

> *ately conform its management services and practices to that stated in the MaComb notice of change . . . .* Debtor, jointly and severally, specifically agree[s] to defend, indemnify, and *save harmless MaComb from any* and all claims, losses, causes-of-action, obligations, and/or *liabilities which may arise in connection with the . . . management of the [collateral], the [collateral], and/or complying with the terms and conditions of this Agreement . . . .* (emphasis added).

partnership units). Thus, the debtors appropriately argued in their summary-judgment motion and response that because the legal-malpractice claims were not assignable, neither the claims nor any proceeds from the claims were validly assigned to MaComb.

We sustain the debtors' first and fifth issues.[18]

### V. Conclusion

Because the debtors' legal-malpractice claims were not assignable, the trial court erred in denying their summary-judgment motion and granting summary judgment and attorneys' fees to MaComb. We therefore reverse the trial court's judgment and declare that the debtors' legal-malpractice claims and the proceeds of such claims were neither pledged nor assigned to MaComb.[19]

---

18. We do not reach the debtors' third issue.

19. The debtors have not sought an award of attorneys' fees; thus, no remand is necessary.