

NUMBER 13-17-00144-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

SUBSEA 7 PORT ISABEL, LLC,                                    Appellant,

v.

PORT ISABEL LOGISTICAL OFFSHORE
TERMINAL, INC.,                                              Appellee.

**On appeal from the 107th District Court
of Cameron County, Texas.**

# O P I N I O N

**Before Chief Justice Contreras and Justices Rodriguez[1] and Benavides
Opinion by Chief Justice Contreras**

This is a landlord-tenant dispute centering on the question of whether a sublease

---

[1] The Honorable Nelda V. Rodriguez, former Justice of this Court, was a member of the panel at the time this case was submitted but did not participate in this decision because her term of office expired on December 31, 2018.

agreement was effectively renewed. The tenant, appellant/cross-appellee Subsea 7 Port Isabel, LLC (Subsea), contends by three issues that the trial court erred in awarding damages and prejudgment interest to the landlord, appellee/cross-appellant Port Isabel Logistical Offshore Terminal, Inc. (PILOT), after a jury found that the sublease was not renewed. PILOT brings eleven unenumerated cross-issues challenging (1) the trial court's failure to award attorney's fees, and (2) a provision in the final judgment allowing Subsea to remove improvements from the subject premises. We affirm in part and reverse and remand in part.

## I. BACKGROUND

Subsea is an engineering and construction firm that manufactures and installs undersea oil and gas pipelines. Starting in 2007, PILOT leased around fifty-four acres at the port of Port Isabel, Texas, from the Port Isabel-San Benito Navigation District (PISBND). On April 29, 2008, Subsea entered into an agreement with PILOT to sublease about half of that property (the sublease premises or subject property), to be used as a "spoolbase" for its undersea pipeline operations. The agreement stated that "[t]his Sublease shall commence on May 1, 2008, and terminate on May 31, 2012 (the 'Initial Term')." Section II of the agreement, entitled "Option to Renew," stated in its entirety as follows:

A.

[PILOT] represents and warrants that the PRIME LEASES' [i.e., the leases between PILOT and PISBND] initial term expires May 31, 2012, and that [PILOT] has the right to renew the term thereof for up to four (4) additional five (5) year terms through the exercise of renewal options pursuant to this Sublease.

B.

[Subsea] is hereby granted, subject to the terms hereof, and provided

2

[PILOT] has exercised its option to renew the PRIME LEASES, and further provided that [Subsea] is not in default in any particular under this Sublease beyond any notice and cure period as set forth in this Sublease; up to four (4) options to renew and extend the term of this Sublease for a term of five (5) years (i.e., no more than four options for five years each) on the expiration of the said initial lease term (of five [5] years) under this Sublease, and any additional option term, as appropriate, if exercised.

C.

No later than March 31, 2012 (and each fifth (5th) March 31 thereafter to and including March 31, 2027, if [Subsea] has exercised its option to renew this Sublease) [Subsea] shall advise [PILOT] in writing whether it wishes to exercise its option to renew the Sublease for the subsequent five (5) year-term beginning on June 1 of such year. If [Subsea] notifies [PILOT] that it wishes to renew the Sublease, [PILOT] shall advise [Subsea] in writing whether it will renew the PRIME LEASES for the same five (5) year term by no later than 30 calendar days following receipt of [Subsea]'s notice. If [PILOT] notifies [Subsea] that it has elected to renew the PRIME LEASE, [Subsea]'s election to renew the Sublease shall be binding and irrevocable and the Sublease shall be renewed for the following five (5) year term.

D.

Any such option (if exercised) will be under the same terms, covenants and conditions of this Sublease, so far as is applicable, except as to rental fees (which are addressed in Paragraph VI below), and subject to the exceptions and reservations contained in this Sublease.

As to rental fees, the agreement stated that "[d]uring the 'rental abatement period' (as that term is defined in the PRIME LEASES)," Subsea will pay a base rent of $11,800 per month, and after that period, the base rent will increase to $20,000 per month. The agreement further stated:

In the event of a renewal or extension of this Sublease, through the exercise of options or otherwise, the said rental and related fees shall be subject to adjustment, but at no time shall the monthly rentals or charges be less than the foregoing amounts, and same will be calculated by taking the foregoing amounts and adjusting same in accordance with the Producer's Price Index ("for all goods"), as calculated every five (5) years (i.e., in the fifth [5th] year of the relevant term), in conjunction with an option to renew.

. . . .

Any late payment (i.e., ten days after the due date) will require the payment

of a charge of 10% of the amount due to avoid a default; any holding over beyond the expiration of the said "lease term" (or any extension thereof) will require the payment of pro rata rentals, in accordance with the rates above.

(Brackets and quotation marks in original.) Finally, the sublease agreement provided that any modifications or amendments to the agreement must be in writing and signed by the parties, and "[a]ny oral representations or modifications concerning this instrument shall be of no force or effect."

Also on April 29, 2008, Subsea, PILOT, and PISBND entered into a "Non-Disturbance Agreement" under which PISBND consented to PILOT subleasing the subject premises to Subsea. The "Non-Disturbance Agreement" provided that PISBND and PILOT will not amend or modify their lease agreement "in any way that affects the [Sublease] Premises or [Subsea]'s rights under the Sublease" without Subsea's prior written consent.

Subsea claims that it spent over $40 million to improve the subject property by, among other things, building a dock, building facilities for fabricating pipes and loading them onto ships, and stabilizing the ground with crushed rock. But after the Deepwater Horizon oil spill in 2010, drilling activity in the Gulf of Mexico slowed dramatically and the facilities on the sublease premises went virtually unused for several years. Thus, in early 2012, Subsea sought to renegotiate the terms of the Sublease before renewing under the agreement. According to Subsea, its operations manager Greg Donnelly spoke with PILOT's then-president, John Stafford, in February or March 2012 about renewing the sublease and about the possibility of "rent abatement." Subsea asserts that Stafford told Donnelly he would discuss the matter with PILOT's board, and that in the meantime, Subsea did not need to send written notice of its intent to renew the sublease before March 31, 2012, as required by the agreement.

4

Steve Bearden, PISBND's executive director, testified that Stafford told him "[Subsea] was going to renew the sublease." However, he acknowledged that Stafford never told him that Subsea "actually renewed the sublease." Bearden testified that PILOT negotiated a new lease with PISBND with a lower rental rate; that the new lease was signed two days after the deadline for Subsea to renew the sublease; and that PISBND would not have signed the new lease if it did not believe that Subsea had already renewed its sublease.

David Dennis, then PILOT's vice president, testified that Stafford told him prior to March 31, 2012, that Subsea "wanted to renew [its] lease." Laura Butler, a Subsea attorney, testified that Donnelly told her prior to March 31, 2012, that he had conversations with Stafford about renewing the sublease.[2]

In May 2012, Scott Brown replaced Stafford as PILOT's president. Donnelly sent an email to Brown on May 22 stating that Subsea intended to renew the lease. The following day, Butler sent a notice of renewal via certified mail. PILOT did not respond to the notices, believing that they were untimely and therefore invalid. Nevertheless, PILOT continued to send rent invoices to Subsea for two years after the initial sublease term expired, and Subsea paid those invoices. Brown testified at trial that he did not believe it was necessary for PILOT to advise Subsea that it considered Subsea a holdover tenant in violation of the sublease agreement.

In April 2014, PILOT sent an eviction notice to Subsea, demanding that Subsea

---

[2] Subsea misrepresents the testimony of Dennis and Butler in its brief. It states in its brief that Dennis "testified that Stafford told him prior to March 31, 2012 that [Subsea] had renewed the Sublease." In actuality, Dennis testified merely that Stafford told him about Subsea's *intention* to renew the sublease, not that the sublease was actually renewed. Subsea also states in its brief that Butler "testified that sometime before March 31, 2012, Donnelly told her that he had renewed the Sublease on behalf of [Subsea]." But Butler testified merely that Donnelly told her he had a "conversation" with Stafford "about the option to renew"; she did not testify that Donnelly told her the sublease had actually been renewed.

5

vacate the premises by May 31, 2014. Subsea, believing that the sublease had been effectively renewed, refused to do so, leading to the instant litigation. In its live pleading, PILOT sought a declaratory judgment confirming that the sublease expired and was not renewed, damages for trespass[3] and breach of contract, and attorney's fees. Subsea's live pleading sought a declaration that the sublease was validly renewed, damages for breach of contract and promissory estoppel, and attorney's fees.[4]

After two weeks of trial, ten of twelve jurors found that: (1) the parties did not orally agree to modify the renewal provisions of the sublease such that Subsea's oral notification and subsequent written notice were sufficient to renew the sublease; (2) PILOT is not estopped from denying that Subsea renewed the sublease; (3) PILOT did not waive strict compliance with the renewal provisions of the sublease such that Subsea's oral notification and subsequent written notice were sufficient to renew the sublease; (4) Subsea trespassed on PILOT's property; (5) PILOT is entitled to $634,710 in damages for the trespass; and (6) Subsea did not substantially and foreseeably rely to its detriment on PILOT's promise, if any, that Subsea did not need to send written notice of renewal before March 31, 2012.[5]

The trial court's judgment, dated December 13, 2016, stated that Subsea "became an unlawful trespasser as of June 1, 2014," and it awarded $634,710 in damages to

---

[3] PILOT asserted in its live pleading that, "[a]s of June 1, 2014, and for all months since, market rent for the [sublease premises] has been $375,000 per month." Because Subsea refused to vacate and was paying only $20,000 per month, PILOT contended that it was entitled to "extraordinary money damages," presumably amounting to $355,000 per month.

[4] PILOT initially filed suit against Subsea in Harris County, and Subsea filed a separate suit against PILOT in Cameron County. The parties agreed to transfer the Harris County suit to Cameron County and to consolidate both proceedings. The trial court then re-aligned the parties pursuant to PILOT's motion, with PILOT designated as the plaintiff/counter-defendant and Subsea designated as the defendant/counter-plaintiff.

[5] The trial court previously granted a directed verdict dismissing PILOT's breach of contract claims.

6

PILOT, along with pre-judgment interest "at the simple rate of 5% per year beginning on June 1, 2014, through the day preceding the date of this Final Judgment, which is the amount of $80,425.58 as of December 13, 2016," and post-judgment interest. The judgment further provided:

> [Subsea] may remove any or all property and improvements located on the [subject property] (including crushed rock), until thirty days from the date of this Judgment or the expiration of any period during which this Final Judgment is superseded by the filing of a bond (or cash in lieu of bond) in accordance with Texas Rule of Appellate Procedure 24, provided that [Subsea] shall be responsible for any costs or expense to repair any physical damage to the property cased by such removal, and further provided that [Subsea] shall not be entitled to remove the dock located on the property . . . .
>
> All property, whether real or personal, including without limitation fixtures and improvements, remaining on the [subject property] after the expiration of thirty days from the date of this Judgment or after the expiration of any period during which this Final Judgment is superseded by the filing of a bond (or cash in lieu of bond) in accordance with Texas Rule of Appellate Procedure 24, is solely and exclusively the property of PILOT.

The judgment did not award attorney's fees to PILOT. Both parties perfected appeals.

## II. SUBSEA'S ISSUES

### A. Affirmative Defenses

By its first issue, Subsea contends that the trial evidence conclusively established its affirmative defenses of equitable estoppel, quasi-estoppel, and waiver. We construe the argument as challenging the legal sufficiency of the evidence to support the jury's rejection of those defenses.

#### 1. Standard of Review

Subsea had the burden to prove estoppel and waiver at trial. *See* TEX. R. CIV. P. 94. When a party challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which it had the burden of proof, that party must demonstrate on

7

appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). We view the evidence in the light most favorable to the finding, and we assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). We defer to the jury's determination as to the credibility of the witnesses and the weight to give their testimony, and we indulge every reasonable inference in support of the finding. *Id.* at 819, 822.

### 2. Equitable Estoppel

The jury found that PILOT is not estopped from denying that Subsea renewed the sublease. Estoppel "generally prevents one party from misleading another to the other's detriment or to the misleading party's own benefit." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008) (citing *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515–16 (Tex.1998)). To establish equitable estoppel, a party must show: (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations." *Id.*[6]

In support of its first issue, Subsea points to Brown's trial testimony, in which he stated that he received Donnelly's May 22, 2012 email advising him that Subsea intended to renew the sublease. Brown repeatedly testified that he did not reply to the email, or to subsequent correspondence from Subsea, because their efforts to renew the sublease

---

[6] In a civil case, when there has been no objection to the jury charge, evidentiary sufficiency is measured by the charge actually submitted. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). Here, the charge precisely tracked the case law cited herein as to equitable estoppel and quasi-estoppel.

after the time provided in the agreement were "bogus." Brown stated that, after the contractual renewal period expired on March 31, 2012, he considered Subsea a holdover, month-to-month tenant. However, PILOT did not notify Subsea that it believed the attempted renewal was invalid. When asked why he did not so notify Subsea, Brown testified:

> I did not send them a notice for several reasons. So first and foremost, when you negotiate a contract or a sublease, you put in the specific things that the parties want to receive notice about. And so, in the sublease itself and in the non-disturbance agreement, there are very clear things that you send a written notice about, where a notice is required. And so, you know, together, committees of each company with their lawyers come up with all the things where a formal written notice where a certified letter is required. And so, a notice that your lease is terminated and now you['re] hold-over is not on that list.

> . . . .

> [Subsea] is a multi-billion dollar large corporation with lawyers on staff, lots of sophisticated employees who deal with contracts far more complicated than this, and I, as a businessman, believe and know that, you know, everybody is responsible for reading and operating under contracts on their own. You don't have to hold somebody else's hand and tell them that they are messing up. You know, if you want to give them a notice on something that you can give them notice on, you do that. But there is no hand holding in the business world with sophisticated companies dealing with each other.

Brown later stated that he declined to notify Subsea that he considered them a holdover tenant because such a notice may have led Subsea to sue. He explained that PILOT was already subject to "another bogus lawsuit" brought by PISBND "for damage to our dock," and because "we are a small company that can't easily afford to be caught up in lawsuits," he "certainly didn't want to trigger a second one, at least until that first one was finished." Brown testified: "I was going to try to lay low, work on business with other customers, and get out of the lawsuit with [PISBND]."

Brown explained why he thought there were "three major clues" from which

9

Subsea should have known it was being considered a holdover tenant:

> [First], they knew that they had to send the notice by March 31, and they didn't do that. So they know they are a hold-over by virtue of that.
>
> Two, they know that if they had renewed, that I would have to send them my 30 day response, making their renewal binding and irrevocable. And they knew that I didn't do that. So they knew they were a hold-over in that way. And so I had no interest in making a renewal binding and irrevocable. I did not want to do that.
>
> And thirdly, we didn't escalate the rent. So you can't say, oh, great, you know, they didn't escalate the rent on us and not know that you are a hold-over tenant. So as [a] big sophisticated company, they knew they were a hold-over tenant, and it's not my job or my place to have to send them a letter to hold their hand to explain that to them.

Subsea also notes that the rent invoices sent by PILOT after the initial sublease term ended, which were entered into evidence, do not indicate that the sublease had terminated or that Subsea was a holdover tenant; instead, they were identical to the invoices that had been sent prior to the end of the initial term. Brown and Bearden both testified that they first learned of PILOT's position only when PILOT demanded Subsea vacate the premises in April 2014.

As to the first two elements of equitable estoppel, Subsea argues that "it is undisputed that PILOT (a) knew that [Subsea] thought it had renewed the Sublease and (b) believed that [Subsea] had not renewed." We disagree—the jury could have reasonably inferred from Brown's testimony, as set forth above, that PILOT believed Subsea should have known its attempted renewal was ineffective. In any event, Subsea does not identify any misrepresentation or concealment of material facts by PILOT. *See Johnson & Higgins of Tex.*, 962 S.W.2d at 515–16 (setting forth elements of equitable estoppel). Subsea contends that PILOT "intentionally concealed its intentions" from Subsea but it does not explain whether or how PILOT's "intention" to consider Subsea a

10

holdover tenant is a "material fact," the concealment of which could give rise to equitable estoppel. And even assuming PILOT's failure to advise Subsea of its determination that the renewal was ineffective was a concealment of a "material fact," Subsea does not identify whether or how it relied on that to its detriment. *See id.* We conclude that Subsea's equitable estoppel defense has not been established as a matter of law. *See Dow Chem. Co.*, 46 S.W.3d at 241.

### 3. Quasi-Estoppel

Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000); *Forney 921 Lot Dev. Partners I, L.P. v. Paul Taylor Homes, Ltd.*, 349 S.W.3d 258, 268 (Tex. App.—Dallas 2011, pet. denied) (noting that "[q]uasi-estoppel (estoppel by contract) is a term applied to certain legal bars, such as ratification, election, acquiescence, or acceptance of benefits"). The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit. *Lopez*, 22 S.W.3d at 864. "Unlike equitable estoppel, quasi-estoppel does not require a showing of a false representation or detrimental reliance." *Forney 921 Lot Dev. Partners*, 349 S.W.3d at 268.

Subsea cites cases which have held that a party who accepts benefits under a lease is precluded by quasi-estoppel from thereafter denying the lease's validity. *See Cadillac Bar W. End Real Estate v. Landry's Rests., Inc.*, 399 S.W.3d 703, 706 (Tex. App.—Dallas 2013, pet. denied) (finding, where lease assignee took possession and operated a business on the subject property, that quasi-estoppel barred it from now claiming that there was never an effective assignment); *Twelve Oaks Tower I, Ltd. v.*

*Premier Allergy, Inc.*, 938 S.W.2d 102, 111 (Tex. App.—Houston [14th Dist.] 1996, no writ) (holding, where lessee challenged the validity of a lease on basis of lack of landlord's consent, that quasi-estoppel barred the claim because lessee "knew about the consent requirement but went ahead" with the agreement and "availed itself of the benefits of the lease for over a year"); *see also Forney 921 Lot Dev. Partners*, 349 S.W.3d at 268–70 (concluding that purchaser was not entitled to terminate contract for sale of land in a municipal utility district, even though the contract did not contain notice of tax and bond information as required by statute, because the contract's terms stated that execution of the agreement constituted acknowledgement of receipt of statutory notice). Subsea argues that PILOT received benefits from the renewal of the sublease, including its rent payments and the improvements it built on the property. Subsea also notes that, according to the evidence, PISBND would not have renegotiated its master lease with PILOT for a lower rental rate if PISBND knew that Subsea did not effectively renew the sublease. It argues that, under the doctrine of quasi-estoppel, PILOT may not now dispute the existence of the renewed sublease.

We disagree that quasi-estoppel bars PILOT from taking the position it did in this case, i.e., that the sublease had not been renewed. PILOT argues that the benefits it received after May 31, 2012, were not the same benefits it would have been entitled to if the sublease had actually been renewed. The agreement provided that, "[i]n the event of a renewal or extension of this Sublease, through the exercise of options or otherwise," the rental fees would be recalculated to adjust for inflation "in accordance with the Producer's Price Index." PILOT claims that, had the sublease been validly renewed, it would have been entitled to raise the rent under that provision; and because it did not demand or receive higher rent payments, it did not "benefit" from its previous position for

12

quasi-estoppel purposes. The sublease agreement also provided that Subsea would owe "pro rata rentals, in accordance with the rates above" in the event of "any holding over beyond the expiration" of the sublease. Brown testified that "rates above" referred to the standard rental rate applicable during the initial sublease term, not the inflation-adjusted rate that would take effect upon "renewal or extension." If the jury believed Brown's testimony, as was its prerogative, *see City of Keller*, 168 S.W.3d at 819, 822, then PILOT would have been entitled to increase the rent after May 31, 2012 only if the sublease were validly renewed, and PILOT's failure to demand that increased rent would support a reasonable inference that it did not accept the benefits of renewal.

In any event, the evidence did not establish as a matter of law that PILOT took a position contrary to the position it took at trial. Bearden testified that Stafford told him Subsea was "going to renew the sublease," but Stafford never told him that the renewal had been effectively accomplished. Indeed, it appears undisputed that PILOT never advised Subsea or PISBND about whether it believed the sublease had been renewed. Moreover, PILOT's conduct in the two years following the attempted renewal—including continuing to accept rental payments and failing to notify Subsea whether it would renew its lease with PISBND—is consistent with a belief that the sublease had not been effectively renewed but that Subsea was instead a holdover tenant.

Subsea places much emphasis on Brown's testimony that he decided to "lay low" and not advise Subsea of PILOT's position in the hopes that he could avoid a lawsuit. Though Brown's conduct falls short of what might be considered full and transparent honesty, there is no indication that he was contractually required to advise Subsea of PILOT's position. Considering the circumstances, we do not believe it would be "unconscionable" for PILOT to now claim that the renewal was invalid, because the jury

13

was entitled to believe that it never took a position to the contrary. *See Lopez*, 22 S.W.3d at 864. We conclude that Subsea's quasi-estoppel defense was not established as a matter of law. *See Dow Chem. Co.*, 46 S.W.3d at 241.

### 4. Waiver

Waiver is the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right. *Ulico Cas. Co.*, 262 S.W.3d at 778 (citing *In re Gen. Elec. Capital Corp.*, 203 S.W.3d 314, 316 (Tex. 2006); *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003); *Bocanegra v. Aetna Life Ins. Co.*, 605 S.W.2d 848, 851 (Tex. 1980)). The elements of waiver include: (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right. *Id.* (citing *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996)).

Subsea contends that PILOT waived its right to complain about the timeliness of the notice of renewal by "consciously cho[osing] not to tell" Subsea about its position until almost two years after the fact. It cites *Burke v. Shafer*, 189 S.W.2d 444, 445 (Tex. App.—Austin 1945, writ ref'd w.o.m.), another case where a lessee was required to give written notice to the landlord of its intent to renew a lease. The lessees claimed they timely sent the required notice, but the landlord testified he did not remember receiving it. *Id.* When the landlord later attempted to evict four years later, claiming the lessees failed to send the required notice, the Austin court of appeals held that, even if the landlord did not receive the written renewal notice, he waived his right thereto "by his stated action in conceding the right of the [lessees] to renew without increase of rental and accepting the rental for four years upon the concession that the right of renewal had been properly exercised by the [lessees]." *Id.* at 447. Subsea also cites *Winslow v. Dillard Department*

14

*Stores, Inc.*, 849 S.W.2d 862, 863 (Tex. App.—Texarkana 1993, writ denied). In that case, the landlord accepted nearly five years of rental payments; did not advise the tenant that it "considered the lease to be terminated"; and did not ask the tenant to vacate the property. *Id.* The Texarkana court of appeals held that the landlord therefore waived his argument that the tenant failed to properly renew the lease, despite the fact that the lease provided that the landlord's failure to declare a default does not waive the default. *Id.* at 864.

Again, Subsea relies on Brown's testimony that he "la[id] low" to avoid any potential lawsuit, arguing that this shows PILOT "made an intentional decision not to enforce its rights and did so with the express purpose of keeping [Subsea] from going to court to resolve any doubts about the status of the Sublease."

We disagree that the evidence established as a matter of law that PILOT actually intended to relinquish, or intentionally acted inconsistently with, its right to complain about the timeliness of Subsea's notice of renewal. *See Ulico Cas. Co.*, 262 S.W.3d at 778. As the Texas Supreme Court recently explained:

> Waiver is largely a matter of intent, and for implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances. There can be no waiver of a right if the person sought to be charged with waiver says or does nothing inconsistent with an intent to rely upon such right.
>
> Waiver is essentially unilateral in character and results as a legal consequence from some act or conduct of the party against whom it operates; no act of the party in whose favor it is made is necessary to complete it. Importantly, while waiver may sometimes be established by conduct, that conduct must be unequivocally inconsistent with claiming a known right.

*Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 485 (Tex. 2017) (footnotes and quotations omitted). Here, it was not established as a matter of law that PILOT acted

15

inconsistently with its claim that Subsea failed to timely renew the sublease. *See Ulico Cas. Co.*, 262 S.W.3d at 778. It is undisputed that, although PILOT did not advise Subsea or PISBND that it considered Subsea a holdover tenant after May 31, 2012, it also never advised those entities that the sublease had been renewed. Further, according to Brown's testimony, the rent payments that it accepted from Subsea after expiration of the initial term were in the amount prescribed for a holdover tenant, not for a tenant which had effectively renewed the sublease.[7] It was also not established as a matter of law that PILOT intentionally acted inconsistently with the right it now seeks to enforce. *See Ulico Cas. Co.*, 262 S.W.3d at 778. Subsea contends that PILOT's acceptance of rent payments after the initial sublease term is evidence that it intended to waive its right to timely notice of renewal. That may be so, but the jury was free to decline to make that inference. *See City of Keller*, 168 S.W.3d at 819, 822.

The cases cited by Subsea are distinguishable or inapposite. *Burke* was an interlocutory appeal of a temporary injunction and, as such, the court did not address the ultimate merits of the waiver question. *See Burke*, 189 S.W.2d at 444, 447 (noting that "we do not pass upon the merits of the case"). Instead, it held that the injunction was proper because the evidence was "sufficient" to support the lessees' claims, and therefore "there was at least a bona fide dispute" concerning whether a sublessee was entitled to possession. *Id.* In *Winslow*, the court's succinct analysis focused entirely on the question of whether the lease's "nonwaiver clause" precluded the landlord's waiver, not whether

---

[7] Subsea argues that, under the sublease agreement, PILOT was entitled (though it was not required) to demand increased rent payments after the initial term regardless of whether it considered the sublease to be validly renewed. However, Subsea does not dispute that PILOT's decision not to demand a rent increase after May 31, 2012, is consistent with its position that Subsea was a holdover tenant as of that date.

16

the facts of the case amounted to waiver in the first place. *See Winslow*, 849 S.W.2d at 864.

For the foregoing reasons, we conclude that Subsea failed to establish its affirmative defenses, including waiver, as a matter of law. Subsea's first issue is overruled.

## B.     Evidence of Trespass Damages

By its second issue, Subsea argues that there was legally insufficient evidence to support the jury's award of trespass damages. The jury was instructed to determine PILOT's trespass damages by figuring "[t]he difference between the rent paid by [Subsea] and the fair market rental value of the premises during the period from June 1, 2014 to December 31, 2016." The jury awarded $634,710, thereby indicating that it found the property at issue had a fair market rental value of $1,500 per acre per month.[8] Subsea contends that the only evidence of the fair market rental value of the sublease property was Brown's testimony, and it argues that his testimony in this regard was incompetent and unreliable.

A legal sufficiency challenge will be sustained only if the record shows (1) a complete absence of evidence of a vital fact, (2) the court is barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *City of Keller*, 168 S.W.3d at 810.

---

[8] It is undisputed that Subsea made $620,000 in rent payments for the thirty-one months between June 2014 and December 2016. The jury therefore implicitly found that the fair market rental value of the property over that time period was $1,254,710 ($620,000 plus $634,710). That amount, divided by thirty-one months and again divided by 26.983 acres (the undisputed size of the sublease premises), results in a figure of $1,500 per acre per month.

17

Evidence is more than a scintilla if it "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011). Evidence is less than a scintilla is if it is "so weak as to do no more than create a mere surmise or suspicion that the fact exists." *Regal Fin. Co. v. Tex Star Motors, Inc.*, 355 S.W.3d 595, 603 (Tex. 2010). The ultimate test is whether the evidence would enable reasonable and fair-minded people to make the finding. *City of Keller*, 168 S.W.3d at 827. As with our review of the evidence supporting Subsea's affirmative defenses, we view the evidence in the light most favorable to the jury's finding, and we defer to its credibility determinations. *Id.* at 819, 822.

"The rental value of a property must be established with reasonable certainty." *City of Austin v. Teague*, 570 S.W.2d 389, 395 (Tex. 1978); *Wood v. Kennedy*, 473 S.W.3d 329, 336 (Tex. App.—Houston [14th Dist.] 2014, no pet.). "A property owner may testify to the value of his property," even if the owner "could not qualify to testify about the value of like property belonging to someone else." *Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 155 (Tex. 2012); *Porras v. Craig*, 675 S.W.2d 503, 504 (Tex. 1984). But "[i]n order for a property owner to qualify as a witness to the damages to his property, his testimony must show that it refers to market, rather than intrinsic or some other value of the property." *Porras*, 675 S.W.2d at 504–05 (noting that "[t]his requirement is usually met by asking the witness if he is familiar with the market value of his property"). When the evidence does not indicate the factual basis behind the owner's valuation, the testimony is conclusory and will be legally insufficient to sustain a judgment. *See Justiss*, 397 S.W.3d at 158–59, 161; *Wood*, 473 S.W.3d at 338.

Subsea first contends that Brown was not qualified to provide expert testimony as to the fair market rental value of the property. Citing *Justiss*, it argues that "[b]ecause a

18

property owner's testimony is the functional equivalent of expert testimony, it must be judged by the same standards." It then contends that Brown's "general experience as an investor in oil and gas related companies does not give him the qualifications and experience required to testify as an expert concerning the fair market value of 27 acres of raw land with a dock."

We disagree that Brown was required to qualify as an expert witness in order to testify regarding the fair market value of the property. As the *Justiss* Court explained, "[t]he Property Owner Rule falls under Texas Rule of Evidence 701, which allows a *lay witness* to provide opinion testimony if it is (a) rationally based on the witness's perception and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." *Justiss*, 397 S.W.3d at 157 (emphasis added) (citing TEX. R. EVID. 701; *Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 852 (Tex. 2011)). "Based on the presumption that an owner is familiar with his property and its value, the Property Owner Rule is an exception to the requirement that a witness must otherwise establish his qualifications to express an opinion on land values." *Id.* Under the Property Owner Rule, an owner's valuation testimony "fulfills the same role that expert testimony does"; however, that testimony is "based on personal knowledge rather than merely on expertise." *Id.* at 157 & n.7. Accordingly, while valuation testimony "may not be based solely on a property owner's *ipse dixit*," the Property Owner Rule establishes that an owner is automatically *qualified* to provide such testimony. *See id.* at 156, 159.[9]

Subsea next argues that Brown's testimony was unreliable because it is "speculative, devoid of foundational support, and based on a faulty, patch-work, and

---

[9] Though PILOT is technically a lessee and not an outright owner of the subject property, Subsea does not dispute that Brown is an owner for purposes of the Property Owner Rule.

unverifiable methodology." Brown's testimony regarding the fair market rental value of the property was based in part on his estimate that Subsea spent $14,134,508 to construct a dock on the sublease premises in 2008. He testified that, as a finance and business major in college, he learned that there are

> a couple of different techniques for looking at the value of properties or in calculating the value of a property or the income of a property, you have got—you look at other sales of businesses or properties that are called comparables. You look at the cost of an asset, whether that's real estate or any kind of business asset, and then you look at a rate of return of income that you would want to make on that asset. Those are a couple of examples.

Brown later testified:

> Q. [PILOT's counsel]  Is one of the acceptable methods for determining a value for rental that you learned about and discussed earlier, return on investment model?
>
> A. [Brown]  Yes.
>
> Q.  Have you, using that capital improvement [of the dock], determined a value for what a reasonable rental would be?
>
> A.  Yes, at an 11 percent rate of return, the monthly rental there would be $129,566 per month.

On cross-examination, Brown acknowledged that he did not consider, in making his estimate, the amount PILOT was paying to PISBND to rent the subject premises, which was around $500 per acre per month, or the amount PILOT was paying to PISBND to rent other adjacent property, which was around $800 per acre per month. Instead, he looked at two comparable properties: a spoolbase facility in Mississippi operated by another undersea pipeline company; and other property in Port Isabel, adjacent to the subject property, for which PILOT received rental payments.

PILOT argues in response that, even if Brown's testimony was speculative or unreliable, there was other evidence on which the jury could have based its finding.

20

Specifically, PILOT points to the testimony of Bryan Duffy, a commercial real estate appraisal expert retained by Subsea to "do some market research." Duffy testified that he did not do an appraisal of the sublease premises, but if he did, he would consider amounts PILOT was paying to rent adjacent dock property because "[t]hat would be a comparable property." Duffy opined that Brown's methodology for determining the fair market rental value was "incomplete" and "insupportable" in part because Brown did not examine "what is being paid for other properties." Though he did not perform an appraisal, Duffy did "look into what the other ports in the Valley are charging and how they price their dock plan," and from this information he determined that the rental values for properties in the PISBND ranged "from $800 per acre per month to $1,500 per acre per month." Additionally, Bearden had told Duffy that PISBND leases dock property for rental fees in that range.

We conclude that Duffy's testimony constitutes more than a scintilla of probative, competent evidence supporting the jury's damages award.[10] Subsea notes that Duffy was not asked to perform an appraisal, and he did not specifically state that his estimate represented the "fair market rental value" of the sublease premises. But the clear implication of Duffy's testimony was that, because similar properties were being leased for $800 to $1,500 per acre per month, that was a fair market price for the sublease premises. And the jury has discretion to award damages within the range of evidence presented at trial. *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002).

The evidence was legally sufficient to support the damages award, regardless of

---

[10] We observe that, though the jury's damages award was at the high end of Duffy's estimate, it was far less than the roughly $4,200 per acre per month that Brown testified to, and it was minuscule compared to the amount PILOT claimed to be entitled to in its live pleading.

21

whether Brown's valuation testimony is considered probative. Subsea's second issue is overruled.

## C.    Prejudgment Interest

By its third issue, Subsea contends the trial court erred in its award of prejudgment interest in the amount of $80,425.58 to PILOT. "Prejudgment interest is compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Ventling v. Johnson*, 466 S.W.3d 143, 153 (Tex. 2015) (citing *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998)). "There are two legal sources for an award of prejudgment interest: (1) general principles of equity and (2) an enabling statute." *Johnson & Higgins*, 962 S.W.2d at 528. We review a trial court's award of prejudgment interest under an abuse of discretion standard. *Johnson v. Ventling*, 462 S.W.3d 92, 97 (Tex. App.—Corpus Christi–Edinburg 2013), *rev'd in part on other grounds*, 466 S.W.3d 143.

The award of prejudgment interest in this case was calculated by applying a simple interest rate of five percent to the total damages award of $634,710, beginning on the day PILOT filed suit—June 1, 2014—and ending on the day before the final judgment was rendered—December 12, 2016. *See Johnson & Higgins*, 962 S.W.2d at 531 ("[U]nder the common law, prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed."); *see also* TEX. FIN. CODE ANN. § 304.104 (providing that, in certain cases, prejudgment interest begins to accrue "on the earlier of the 180th day after the date the defendant receives written notice of a claim or the date the suit is filed"). Subsea notes, though, that the damages award encompassed the fair market value of rental payments that were due

each month from June 2014 to December 2016. It argues that "PILOT is not entitled to prejudgment interest beginning on June 1, 2014 for rent that did not accrue" until well after that date.

Subsea cites *Garden Ridge, L.P. v. Clear Lake Center, L.P.*, 504 S.W.3d 428 (Tex. App.—Houston [14th Dist.] 2016, no pet.), and *Roberson v. Robinson*, 761 S.W.2d 51, 54 (Tex. App.—San Antonio 1988), *rev'd on other grounds*, 768 S.W.2d 280 (Tex. 1989). In *Garden Ridge*, a tenant claimed its landlord breached the lease by overcharging it for common area maintenance costs. 504 S.W.3d at 433. The jury found in the tenant's favor and awarded damages which included amounts paid by the tenant after suit was filed. *Id.* at 434. The Fourteenth Court of Appeals held that the tenant was entitled only to prejudgment interest "accruing on a monthly basis for each post-suit breach," as it requested at oral argument. *Id.* at 452–53. The court noted that the tenant "has not argued in this court nor the trial court that its post-suit claims accruing after September 10, 2009," the date suit was filed, "should begin to earn interest on September 10, 2009." *Id.* at 453. The court attached a recalculated interest schedule as an exhibit to its opinion. *See id.* at 453–55.

In *Roberson*, a landlord was awarded "accrued and unpaid rent of $200.00 per month from January 1, 1981, through April 30, 1982" and "[t]he reasonable rental value of the leasehold from May 1, 1982, through February 15, 1986," for a total of $66,900 in damages. 761 S.W.2d at 52. The trial court awarded prejudgment interest on the entire amount, to accrue "from January 1, 1981, until the date of judgment . . . ." *Id.* The San Antonio Court of Appeals found that the interest award was erroneous, holding that interest "for the loss of rental value fixed upon a monthly basis" is "simple interest at the rate of 6% per annum on each monthly rental commencing thirty (30) days from the time

23

each rental payment was due and payable up to the date of the judgment rather than as assessed by the trial court." *Id.* at 53–54.

Responding to this issue, PILOT does not dispute that at least part of the $634,710 damages award was attributable to rental periods for which payment became due after June 1, 2014. Instead, it disputes the notion that the lump sum amount awarded by the jury was attributable *equally* to each of those rental periods. PILOT argues that it is improper to simply take the lump sum figure and divide it by the number of months to come up with a monthly average because that "assumes that the jury did not find the fair market rental value fluctuated a single penny during this period of time." PILOT also cites the Texas Supreme Court's opinion in *Johnson & Higgins*, 962 S.W.2d at 531, for the proposition that "prejudgment interest on a trespass claim, as here, begins to accrue on the date set forth in the final judgment submitted by Plaintiff and signed by the Court." But *Johnson & Higgins* was not a trespass case and did not involve any amount of damages accruing after the date suit was filed. And PILOT directs us to no evidence upon which the jury could have reasonably concluded that the fair market rental value of the sublease premises fluctuated at all between June 1, 2014 and December 12, 2016. It does not dispute that the jury's award was based exclusively on testimony, such as Brown's and Duffy's, which presumed the rental value was the same for each month for which damages were claimed.

Resolution of this issue requires us to determine whether prejudgment interest was awarded in this case on the basis of equity or statute, a question Subsea does not explicitly address. Section 304.104 of the finance code, which both parties cite, requires prejudgment interest to begin accruing "on the earlier of the 180th day after the date the defendant receives written notice of a claim or the date the suit is filed," but that statute

24

applies only to "a wrongful death, personal injury, or property damage case." *See* TEX.

FIN. CODE ANN. §§ 304.101, .104. This is not such a case, and the parties cite no other

statutory basis for the award of prejudgment interest. Accordingly, we conclude the award

was based on common law principles of equity. In *Johnson & Higgins*, the Texas

Supreme Court explained that equitable prejudgment interest, like the statutory variety,

"begins to accrue on the earlier of (1) 180 days after the date a defendant receives written

notice of a claim or (2) the date suit is filed." 962 S.W.2d at 531. However, as noted,

none of the damages awarded in *Johnson & Higgins* were attributable to events, such as

the monthly post-suit accrual of rent payments, that occurred after suit was filed. We

therefore decline to construe *Johnson & Higgins* as establishing an inflexible rule

requiring the accrual of prejudgment interest on all damages, no matter when incurred, to

start at the time suit is filed. Rather, we conclude that the trial court abused its discretion

by ordering prejudgment interest to begin accruing on June 1, 2014, for damages

attributable to rental payments which became due after that date. Instead, to conform

with principles of equity, interest must begin "accruing on a monthly basis for each post-

suit breach." *See Garden Ridge, L.P.*, 504 S.W.3d at 453[11]; *Roberson*, 761 S.W.2d at

54; *see also Johnson & Higgins*, 962 S.W.2d at 528 (noting that prejudgment interest, by

definition, accrues only "during the lapse of time between the accrual of the claim and the

---

[11] PILOT notes correctly that the *Garden Ridge* court ordered "interest accruing on a monthly basis for each post-suit breach" only because that is what the plaintiff requested at oral argument. *Garden Ridge, L.P. v. Clear Lake Center, L.P.*, 504 S.W.3d 428, 453 (Tex. App.—Houston [14th Dist.] 2016, no pet.). The court cited case law establishing that it "may not award more relief than requested." *Id.* PILOT did not similarly limit its request. Therefore, *Garden Ridge* is not directly on point.

Notwithstanding the dearth of direct authority, it is apparent that the method used for calculating prejudgment interest in *Garden Ridge* is appropriate here. As noted, the purpose of prejudgment interest is to compensate a claimant for "lost use of the money due as damages during the lapse of time *between the accrual of the claim* and the date of judgment." *Ventling v. Johnson*, 466 S.W.3d 143, 153 (Tex. 2015) (emphasis added). Therefore, equitable prejudgment interest may not be awarded on damages amounts which have not yet accrued.

25

date of judgment").

Subsea's third issue is sustained.

## III. PILOT'S CROSS-ISSUES

**A.    Attorney's Fees and Costs**

PILOT raises six cross-issues concerning the trial court's refusal to award it attorney's fees and court costs.  Specifically, it argues:  (1) it was error to deny fees and costs; (2) PILOT was entitled to fees under the language of the sublease; (3) Subsea was estopped from arguing PILOT was not entitled to fees and costs; (4) Subsea judicially admitted fees were available under the sublease; (5) Subsea [sic] is entitled to fees under the Uniform Declaratory Judgments Act (UDJA); and (6) PILOT was entitled to court costs under the language of the sublease.

The sublease agreement contained a section entitled "XXVI. Arbitration" which stated in its entirety as follows:

A.

ONLY IN THE CASE OF ANY DISPUTE, CONTROVERSY OR CLAIM ARISING UNDER OR RELATING TO THIS SUBLEASE AND INVOLVING [PISBND], OR THE BREACH, TERMINATION OR INVALIDITY THEREFOF AS IT PERTAINS TO [PISBND], SHALL A DISPUTE UNDER THIS SUBLEASE BE SETTLED BY ARBITRATION, IN WHICH EVENT SUCH ARBITRATION SHALL BE IN ACCORDANCE WITH THE FEDERAL ARBITRATION ACT, AND THE COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCATION (THIS DOES NOT REQUIRE THE USE OF SUCH ASSOCIATION, AND SUCH RULES ARE ONLY PROCEDURES FOR THE ARBITRATION), USING ONE ARBITRATOR, TO BE SELECTED BY AGREEMENT OF THE PARTIES — SUCH ARBITRATION TO BE CONDUCTED IN BROWNSVILLE, CAMERON COUNTY, TEXAS, IN THE ENGLISH LANGUAGE — AND A JUDGMENT UPON THE AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF.

B.

If any such proceeding is initiated to resolve a dispute arising under or

26

relating to this Sublease by any of the parties hereto, it is expressly agreed that the prevailing party shall be entitled to recover from the other party reasonable attorney's fees and expenses, in addition to any other relief that may be awarded.

PILOT contends that the phrase "any such proceeding," in paragraph XXVI.B above, refers to any effort to resolve a dispute under the sublease, not just arbitration. It posits that the definition of "proceeding" must encompass more than just arbitration because paragraph XXVI.A never refers to the contemplated arbitration as a "proceeding." According to PILOT, if the parties had intended paragraph XXVI.B to apply only to arbitration filed under paragraph XXVI.A, they would have used the terms "arbitration" or "such arbitration" rather than "such proceeding." PILOT concedes, though, that paragraph XXVI.A "is irrelevant with regard to this case because it only applies to and only requires arbitration" in a "DISPUTE, CONTROVERSY OR CLAIM . . . . INVOLVING [PISBND]," which the instant suit did not.

We disagree with PILOT's interpretation of this contractual provision. PILOT is correct that the phrase "any such proceeding" in paragraph XXVI.B means more than just arbitration, but that is because the preceding paragraph contemplated more than just an arbitration proceeding—it also contemplated a proceeding in a court of law to obtain a judgment memorializing the arbitration award. PILOT's construction of the phrase "any such proceeding" ignores the word "such," the presence of which clearly indicates that the parties intended to refer back to the two types of proceedings mentioned in the prior paragraph. Indeed, if the parties truly intended for paragraph XXVI.B to apply to any and all efforts to resolve a dispute under the sublease, no matter the forum, they could have easily done so by omitting the word "such." *See DIRECTV Grp., Inc. v. United States*, 670 F.3d 1370, 1381 (Fed. Cir. 2012) ("As a matter of elementary grammar, the statute's

27

use of 'such' is a demonstrative adjective, and it must refer to a clear antecedent."); *United States v. Krstic*, 558 F.3d 1010, 1013 (9th Cir. 2009) (noting that, when the word "such" is used as a demonstrative adjective, it is defined as "of the type previously mentioned"); *see also Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 94 (2007) (holding that, in the statutory phrase "with per-pupil expenditures . . . above the 95th percentile or below the 5th percentile of such expenditures in the State," "[t]he word 'such' refers to 'per-pupil expenditures'").

PILOT contends that Subsea judicially admitted, and is judicially estopped from denying, that PILOT was entitled to fees and costs under paragraph XXVI.B of the sublease because Subsea requested fees under that same paragraph in its live pleading. The doctrine of judicial estoppel precludes a party from adopting a position inconsistent with one that it maintained successfully in an earlier proceeding. *Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 6 (Tex. 2008); *Patel v. Harris Cty. Appraisal Dist.*, 434 S.W.3d 803, 814 (Tex. App.—Houston [14th Dist.] 2014, no pet.). But the doctrine does not apply to a contradictory position taken in the same proceeding. *Pleasant Glade Assembly of God*, 264 S.W.3d at 6. And though "[c]ontradictory positions taken in the same proceeding may raise issues of judicial admission," *id.*, "[a] party may not judicially admit a question of law." *H.E. Butt Grocery Co. v. Pais*, 955 S.W.2d 384, 389 (Tex. App.—San Antonio 1997, no pet.); *Pierce v. Pierce*, 850 S.W.2d 675, 679 (Tex. App.—El Paso 1993, writ denied); *Ft. Bend Cent. Appraisal Dist. v. Hines Wholesale Nurseries*, 844 S.W.2d 857, 858 (Tex. App.—Texarkana 1992, writ denied). Because the issue of whether paragraph XXVI.B of the sublease agreement authorized fees is a question of law, it is not subject to judicial admission. *See URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018) (noting that the "interpretation of an unambiguous

contract" is a question of law reviewed de novo).

PILOT next argues that it was entitled to attorney's fees under the UDJA. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 ("In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just."). But as the Texas Supreme Court has explained, "simply repleading a claim as one for a declaratory judgment cannot serve as a basis for attorney's fees, since such a maneuver would abolish the American Rule and make fees available for all parties in all cases." *Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 624 (Tex. 2011) (citing *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 669 (Tex. 2009)).

> When a claim for declaratory relief is merely tacked onto statutory or common-law claims that do not permit fees, allowing the UDJA to serve as a basis for fees would violate the rule that specific provisions should prevail over general ones. The declaratory judgment claim must do more than merely duplicate the issues litigated via the contract or tort claims.

*Id.* (quotations and citation omitted). PILOT points out that the elements of a trespass cause of action differ from those it asserted as part of its request for declaratory relief. However, we conclude that the trial court did not abuse its discretion by implicitly finding that PILOT's UDJA claims were duplicative of and subordinate to its trespass claim. *See Oake v. Collin County*, 692 S.W.2d 454, 455 (Tex. 1985) (noting that the denial of attorney's fees under the UDJA is reviewed for abuse of discretion).

Finally, PILOT argues that the trial court failed to articulate any good cause for failing to award costs under Texas Rules of Civil Procedure 131. *See* TEX. R. CIV. P. 131 ("The successful party to a suit shall recover of his adversary all costs incurred therein, except where otherwise provided."); *see also* TEX. R. CIV. P. 141 ("The court may, for good cause, to be stated on the record, adjudge the costs otherwise than as provided by law or these rules."). But as Subsea notes, although the jury found in favor of PILOT, its

29

award of damages did not even approach the amount requested by PILOT in its pleadings, and Subsea successfully obtained a provision in the final judgment allowing Subsea to remove its improvements from the property, over PILOT's objection. Under these circumstances, the trial court was within its discretion to order that the parties bear their own court costs. *See Henry v. Masson*, 453 S.W.3d 43, 50 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (noting that an appellate court reviews a trial court's decision to award court costs for abuse of discretion).

We conclude that PILOT was not entitled to attorney's fees and court costs under the terms of the sublease, and the trial court did not err in refusing to award fees under the UDJA. PILOT's cross-issues regarding fees and costs are overruled.

## B.  Removal of Improvements

PILOT's five remaining issues on cross-appeal concern the portion of the final judgment permitting Subsea to remove its property and improvements from the sublease premises within thirty days of the judgment. PILOT argues:  (1) it was error to allow Subsea to remove property and improvements; (2) the plain language of the sublease required Subsea to remove its improvements in 2014 upon service of the notice to vacate; (3) Subsea waived its right to remove improvements; (4) Subsea failed to obtain written consent from PISBND under the sublease; and (5) Subsea failed to comply with certain provisions of the Texas Property Code, resulting in the "loss" of the improvements.

PILOT bases these issues on paragraph V.J of the sublease agreement, which is contained within a section entitled "Leasehold Operation," and which provides as follows:

> [Subsea] also agrees that, upon termination of this Sublease, [Subsea] shall have the option to either (i) leave the Sublease Premises in the condition that the Sublease Premises are in at the conclusion of the Sublease, or (ii) remove any or all property and improvements then located on the Sublease Premises, provided that [Subsea] shall be responsible for any costs or

30

expense to repair any physical damage to the Sublease Premises caused by such removal, and further provided [Subsea] shall not be entitled to remove "[Subsea]'s Dock" (hereinafter defined).

Notwithstanding the foregoing, [PILOT] acknowledges that [Subsea] intends to add crushed rock to the Sublease Premises that may or may not be removed upon termination of this Sublease, at [Subsea]'s option.

According to PILOT, because the jury determined that the sublease in fact terminated on May 31, 2014, Subsea's option to remove its property from the premises under paragraph V.J also terminated on that date. PILOT argues that, because Subsea did not remove its improvements at that time, it implicitly declined its option to do so under paragraph V.J of the sublease; and by failing to do so for two years after the initial lease term, it waived its right to remove improvements at all. It cites case law establishing that "in the absence of equities an optionee is held to a strict compliance with the terms of the option agreement." *Zeidman v. Davis*, 342 S.W.2d 555, 558 (Tex. 1961).

In response, Subsea notes that, prior to trial, the trial court granted a motion in limine which sought to exclude any testimony regarding PILOT's damages that presumed that the improvements would remain on the premises. It also notes that the trial court rejected PILOT's request for a jury charge question asking whether Subsea elected to leave its property and improvements on the premises under paragraph V.J. Subsea observes that PILOT challenges neither the order in limine nor the jury charge ruling on cross-appeal.

After trial, the court must render a judgment that "conform[s] to the pleadings, the nature of the case proved and the verdict, if any," and is "so framed as to give the party all the relief to which he may be entitled either in law or equity." TEX. R. CIV. P. 301. Here, even assuming that the property removal provisions of the sublease agreement may be properly characterized as an "option agreement," we cannot say that the trial court erred

31

in allowing Subsea to retrieve its property within thirty days of the judgment. First, though paragraph V.J of the sublease agreement provides that Subsea may elect whether to leave the premises as-is or to remove the property and improvements, it does not explicitly provide a timeframe for when this election would be made except to say that the option would come into effect "upon termination of this Sublease." Arguably, then, even if Subsea waited until after the final judgment to elect to remove the improvements, that would be permissible under paragraph V.J. Second, Subsea has always maintained that the lease did not terminate on May 31, 2014, but instead was effectively renewed. This was the central issue at trial and, although the jury eventually found against Subsea on this issue, it would have been inequitable in these circumstances for the trial court to render judgment precluding Subsea from recovering its property. *See Zeidman*, 342 S.W.2d at 558.

Because Subsea consistently asserted that the sublease had not terminated, we conclude that Subsea did not intentionally waive its right to retrieve its property and improvements from the sublease premises. *See Ulico Cas. Co.*, 262 S.W.3d at 778 (elements of waiver).

PILOT additionally argues that the subject provision of the final judgment was improper because there was no evidence that Subsea obtained written consent from PISBND to build certain improvements on the premises, as required by the sublease.[12]

---

[12] Paragraph V.E of the sublease agreement provided in part:

[Subsea] acknowledges that no alterations, additions or improvements shall be made on or to the Sublease Premises, on the land, or along the channels, without the consent of [PISBND] in writing, based on building, fire, setback, electric and health codes or standards adopted by [PISBND]. . . . All alterations, additions and improvements made by [Subsea] without such consent shall, unless [PILOT] elects otherwise, belong to [PILOT] (subject to the terms of the PRIME LEASES), at [Subsea]'s expense.

32

We disagree. PILOT first raised this argument in a motion to modify the final judgment; it did not do so in its pleadings or at trial and the issue was not tried by consent. Accordingly, had the trial court rendered judgment based in any part on this argument, it would have violated the rule requiring judgments to conform to the pleadings. *See* TEX. R. CIV. P. 301; *see also Mapco, Inc. v. Carter*, 817 S.W.2d 686, 688 (Tex. 1991) (per curiam) (holding judgment was improper where no pleadings or evidence supported the theory of recovery on which the judgment was based); *Bhatia v. Woodlands N. Hous. Heart Ctr., PLLC*, 396 S.W.3d 658, 664 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) ("We cannot reverse the trial court's judgment based on a theory of recovery not pleaded and proven below.").

Finally, PILOT contends the property removal provision was improper under Texas Property Code § 22.021, entitled "Plea for Removal of Improvements," which states in its entirety as follows:

(a)　A defendant in a trespass to try title action who is not the rightful owner of the property in controversy may remove improvements made to the property if:

(1)　the defendant, and those under whom the defendant claims, possessed the property, and made permanent and valuable improvements to it, without intent to defraud; and

(2)　the improvements can be removed without substantial and permanent damage to the property.

(b)　The pleadings of a defendant who seeks to remove improvements must contain:

(1)　a statement that the defendant, and those under whom the defendant claims, adversely possessed the property, and made permanent and valuable improvements to it, without intent to defraud;

(2)　a statement identifying the improvements; and

(3)　an offer to provide a surety bond in an amount and

33

> conditioned as required by this section.

> (c)    Before removing the improvements, the defendant must post a surety bond in an amount determined by the court, conditioned on the removal of the improvements in a manner that substantially restores the property to the condition it was in before the improvements were made.

TEX. PROP. CODE ANN. § 22.041.  It is undisputed that Subsea did not plead the specific information required by this statute.  However, the statute is not applicable to Subsea because Subsea is not a "defendant in a trespass to try title action."[13]  *See id.*  PILOT and Subsea disagreed on who was entitled to possession of the sublease premises, but neither party ever claimed to have title ownership.  *See id.* § 22.001(a) ("A trespass to try title action is the method of determining title to lands, tenements, or other real property."); *see also Title*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining title as "[t]he union of all elements (as ownership, possession, and custody) constituting the legal right to control and dispose of property").

Even if Subsea were considered a "defendant in a trespass to try title action," § 22.045 of the property code states that "[t]he remedy of removing improvements may be pleaded as an alternative to all other remedies at law or in equity."  TEX. PROP. CODE ANN. § 22.045.  Here, the trial court's decision to include in the final judgment a provision allowing Subsea to remove its improvements was based on the terms of the sublease agreement, not § 22.041 of the property code.  Therefore, Subsea's failure to plead the specific information required by this statute would not render the judgment's property removal provision erroneous or improper.

---

[13] The trial court's final judgment stated in part that, "[b]ased on the jury's verdict, PILOT is entitled to the award of a judgment against [Subsea] on PILOT's claims for trespass, trespass to try title, and a declaratory judgment that the [sublease] was not renewed by [Subsea]."  However, PILOT's live pleading did not contain a claim for trespass to try title, and the jury was not asked to determine title to the subject property.

PILOT's issues in this regard are overruled.

## IV. Conclusion

We reverse the trial court's award of prejudgment interest and remand for recalculation consistent with this opinion. The remainder of the judgment is affirmed.

DORI CONTRERAS
Chief Justice

Delivered and filed the
20th day of June, 2019.

35